No. 22-6903

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICKY BUTLER,

*Plaintiff–Appellant,*

v.

EDWARD HULL, *et al.*,

*Defendants–Appellees.*

On Appeal from a Final Judgment of the
United States District Court for the Eastern District of Virginia
Case No. 1:18cv-1525, Hon. T.S. Ellis III; Hon. Michael S. Nachmanoff

### OPENING BRIEF FOR APPELLANT

RICHARD B. KATSKEE
MARGARET ASH†
SARAH GRACE HUDSON†
TIMOTHY J. SOUTHAM†
*Duke University*
*School of Law*
*210 Science Dr., Box 90360*
*Durham, NC 27708-0360*
*(919) 613-7230*

*Counsel for Appellant*

† Law student appearing under Cir. R. 46(a).

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................. ii

Introduction ............................................................................................. 1

Jurisdictional Statement .......................................................................... 4

Issues Presented ...................................................................................... 4

Statement of the Case ............................................................................. 5

    A.   Record Evidence ......................................................................... 5

    B.   History of This Action ............................................................... 15

Summary of Argument ........................................................................... 19

Standard of Review ................................................................................ 21

Argument ................................................................................................ 22

I.   Mr. Butler Raised Genuine Issues Of Material Fact That Jail Officials Failed To Protect Him. .......................................................... 24

II.   Mr. Butler Raised Genuine Issues Of Material Fact That Jail Officials Were Deliberately Indifferent To His Serious Medical Needs. ........... 33

    A.   The jail officials here may be held liable if they knew or should have known of Mr. Butler's mental illness and did not adequately address it. ........................................................... 34

    B.   Substantial record evidence supports that Mr. Johnson recklessly acted and failed to act, exhibiting deliberate indifference to Mr. Butler's serious medical needs. ..................... 36

    C.   Substantial record evidence supports that jail officials knew or should have known of Mr. Butler's serious medical needs and were reckless regarding the risks and harms from their actions. .............................................................. 40

Conclusion .............................................................................................. 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Connor,*
    105 F.4th 174 (4th Cir. 2024)............................................................21

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ..............................................................19, 22, 36

*Bowring v. Godwin,*
    551 F.2d 44 (4th Cir. 1977) ............................................................34

*Brown v. Lamanna,*
    304 Fed. App'x 206 (4th Cir. 2008)..............................................41, 42

*De'lonta v. Johnson,*
    708 F.3d 520 (4th Cir. 2013) ....................................................34, 41, 45

*DePaola v. Clarke,*
    884 F.3d 481 (4th Cir. 2018) ............................................................34

*Estelle v. Gamble,*
    429 U.S. 97 (1976) .................................................. 22, 36, 40, 41, 43

*Farmer v. Brennan,*
    511 U.S. 825 (1994) .................................................. 24, 25, 27, 32, 35

*Gordon v. Kidd,*
    971 F.2d 1087 (4th Cir. 1992) ....................................................1, 25, 34

*Greeno v. Daley,*
    414 F.3d 645 (7th Cir. 2005) .................................................. 37, 41, 43, 44

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ....................................................................40, 41

*Hammock v. Anodh,*
    2024 WL 33694 (4th Cir. Jan. 3, 2024) ..............................................24

*Iko v. Shreve,*
    535 F.3d 225 (4th Cir. 2008) ............................................................25, 28

*Jackson v. Sampson,*
    536 Fed. App'x 356 (4th Cir. 2013)......................................................26

*Johnson v. Doughty,*
    433 F.3d 1001 (7th Cir. 2006) ............................................................36

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ....................................................... 19, 22, 23, 36, 40

*Makdessi v. Fields*,
  789 F.3d 126 (4th Cir. 2015) ................................................... 32

*Milla v. Brown*,
  109 F.4th 222 (4th Cir. 2024) .................................................. 24

*Ruiz v. Estelle*,
  503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part and
  rev'd in part*, 679 F.2d 1115 (5th Cir. 1982), *vacated
  in part on other grounds*, 688 F.2d 266 (5th Cir. 1982) ................... 36, 39

*Sconiers v. Lockhart*,
  946 F.3d 1256 (11th Cir. 2020) .................................................. 3

*Short v. Hartman*,
  87 F.4th 593 (4th Cir. 2023)............................................*passim*

*Stokes v. Sterling*,
  10 F.4th 236, 246 (4th Cir. 2021), *vacated
  on other grounds*, 142 S. Ct. 2751 (2022) ................................. 26

*Wiggins v. Smith*,
  539 U.S. 510 (2003) ................................................................ 26

*Williams v. Vincent*,
  508 F.2d 541, 544 (2nd Cir. 1974) ..................................... 41, 42

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ............................................................. 24

*Wright v. Collins*,
  766 F.2d 841 (4th Cir. 1985) ................................................ 41

*Youngberg v. Romeo*,
  457 U.S. 307 (1982) ....................................................... 36, 37

## TABLE OF AUTHORITIES—continued

**Page(s)**

### Constitution, Statutes, and Regulations

U.S. CONST. amend. VIII ..................................................... 19, 22, 35, 43, 45

U.S. CONST. amend. XIV ............................................................... *passim*

28 U.S.C. § 1291 ........................................................................................ 4

28 U.S.C. § 1331 ........................................................................................ 4

42 U.S.C. § 1983 ...................................................................................... 2, 4

6 VA. ADMIN. CODE § 15-40-1045 (2024) .................................................. 9, 26

### Other Authorities

DIAGNOSTIC AND STATISTICAL MANUAL OF
     MENTAL DISORDERS (5th ed. 2013) ........................................................ 8, 28

*Intermittent Explosive Disorder: Symptoms and Causes*,
     MAYO CLINIC (Jan. 6, 2024), https://tinyurl.com/zpcusajb ......................... 8

*Involuntary Psychiatric Hospitalization*, FAIRFAX–FALLS
     CHURCH COMMUNITY SERVICES BOARD (June 2024),
     https://tinyurl.com/32sye7x8 ..................................................................... 10

NATIONAL INSTITUTE OF MENTAL HEALTH,
     *Borderline Personality Disorder* (April 2024) ........................................ 28

Virginia Department of Corrections, *Mental Health and
     Wellness Services: Screening, Assessment, and
     Classification*, VIRGINIA DEPARTMENT OF CORRECTIONS
     OPERATING PROCEDURE 730.2 (Apr. 1, 2024) ............................... 6, 37, 38

**INTRODUCTION**

Ricky Butler struggled with a severe psychiatric condition while in pretrial detention at Northern Neck Regional Jail. The record contains abundant evidence that he cut his arms and neck, swallowed sharp pieces of metal, hanged himself from light fixtures, and jammed wooden sticks and metal shards from broken shackles into his penis. The record also contains substantial evidence that, over a four-month period, Northern Neck officials and medical personnel, ignored their legal duty to protect Mr. Butler from himself (s*ee Gordon v. Kidd*, 971 F.2d 1087, 1097 (4th Cir. 1992)) and failed to take the necessary precautions to limit Mr. Butler's access to the metal that he used for repeated acts of self-mutilation. A substance-abuse counselor, who was unqualified to diagnose or treat psychological illnesses unrelated to substance use, flatly dismissed as manipulative the manifestations of Mr. Butler's mental illness. Following his lead, jail officials ignored and degraded Mr. Butler, punishing him as a con artist rather than treating him as a detainee plagued by mental illness.

Even as Mr. Butler continued to self-harm, shoving metal into his penis and swallowing metal shards, record evidence supports that Northern Neck officials refused to change course or take steps that would have prevented further acts of self-mutilation. By not responding promptly, jail officials gave Mr. Butler the time and tools to jam metal pieces down his

throat and into his penis on multiple occasions, allowing metal to remain inside his penis despite the excruciating pain that he suffered. During the four-month period from September 2017 through January 2018, Northern Neck officials left Mr. Butler to struggle with his mental illness and its consequences, rather than treating and protecting him.

Mr. Butler sought to vindicate his rights by bringing this Section 1983 action and presenting substantial evidence in support of his Fourteenth Amendment claims of failure to protect and deliberate indifference. He documented his extensive history of self-harm; he exposed glaring inconsistencies in the medical notes taken by Northen Neck's putative mental-health providers; and he demonstrated the shortcomings of Northern Neck's response to his condition. The district court nonetheless granted the jail officials' motion for summary judgment.

Since the district court issued its rulings, however, this Court has expanded the legal standard against which to measure Fourteenth Amendment claims by pretrial detainees. In *Short v. Hartman*, the Court held that pretrial detainees may bring Fourteenth Amendment claims against jail officials on either an objective or subjective basis. 87 F.4th 593, 611 (4th Cir. 2023). Hence, it is now enough to show that officials should have known of a detainees' illness or injury and should have known that their actions, or lack thereof, posed a high risk of further injury. Without

the benefit of *Short*, the district court analyzed Mr. Butler's claims under only the subjective actual-knowledge standard. The expansion to an objective constructive-knowledge test alone necessitates vacatur and remand for proper consideration under *Short*.

But even without this new, less-demanding standard, Mr. Butler presented evidence sufficient for a factfinder to conclude that the Northern Neck officials *did* know of the danger that he posed to himself and yet did not adequately respond.

Under either the objective or subjective inquiry, Mr. Butler, a pretrial detainee proceeding *pro se* despite being later recognized by the district court as mentally incompetent, was and is entitled to have the courts credit the "specific facts" in his sworn complaint when determining whether the jail officials are entitled to summary judgment. *Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Given that leeway, in addition to Mr. Butler's status as the nonmoving party entitled to have ambiguities resolved in his favor and *Short*'s lesser burden for Fourteenth Amendment claims, numerous questions of material fact remain that preclude summary judgment and warrant reversal (or else vacatur) and remand for further discovery and trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to consider this Section 1983 action under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered partial summary judgment in favor of Northern Neck officials in March 2020 (J.A. 411) and a final summary judgment in their favor in July 2022 (J.A. 679).

## ISSUES PRESENTED

Jail officials are liable for their failures to protect detainees from harm and for their deliberate indifference to serious medical needs when the officials should have known, or did in fact know, that a detainee was at risk of serious harm, yet the officials did not act to prevent it.

I. There is record evidence that jail officials did not prevent Mr. Butler from harming himself repeatedly over a four-month period, despite knowing his lengthy history of self-mutilation. Has Mr. Butler raised genuine issues of material fact sufficient to preclude summary judgment on his failure-to-protect claims?

II. There is record evidence that jail officials failed to change Mr. Butler's treatment despite ongoing physical and mental harm. Has Mr. Butler raised genuine issues of material fact sufficient to preclude summary judgment on his claims for deliberate indifference to his serious medical needs?

4

## STATEMENT OF THE CASE

### A.    Record Evidence

The record includes the following evidence:

While in pretrial custody on federal charges (J.A. 87), Mr. Butler was intermittently detained at Northern Neck Regional Jail between June 2016 and February 2018 (J.A. 417–18). The record shows that even before he arrived in June 2016, Northern Neck officials knew that he might be a challenging inmate: Superintendent Hull stated in his affidavit that Mr. Butler was removed by request from multiple local jails in New York and Ohio. J.A. 87. And Captain Turner informed colleagues that Mr. Butler was "on heightened observation." J.A. 97.

This appeal and the focus of Mr. Butler's evidence and legal claims are Northern Neck officials' conduct between September 2017 and January 2018. J.A. 411; J.A. 418. Before that, Mr. Butler had already flooded his cell several times; he had inserted plexiglass into his penis and anus, requiring medical attention; and he had been cited for throwing feces. J.A. 97–98. In April 2017, Mr. Butler had informed an officer of suicidal thoughts, so he was placed on suicide watch. J.A. 98.

In September, after Mr. Butler flooded his cell again (J.A. 418), jail officials moved him to punitive segregation, in a cameraless cell, in a part of the jail known as "N Pod" (J.A. 34; J.A. 376). When Mr. Butler was moved

5

to N Pod, he requested suicide watch because of his "suicidal feelings." J.A. 34. On suicide watch, Mr. Butler would have received security checks every 15 minutes in a camera-equipped cell. J.A. 34; J.A. 99. But the jail officials refused. J.A. 34. Instead, they left him in that cameraless cell and conducted only the minimal number of checks required for ordinary, non-suicidal detainees—two per hour at discretionary intervals. J.A. 113; J.A. 701. What started as a 15-day disciplinary sanction turned into a four-month stay in punitive segregation. J.A. 88.

On September 13, Mr. Butler was transferred to a medical cell after an officer discovered that he had cut his arm. J.A. 99; J.A. 731. The next day, Keith Johnson, a substance-abuse counselor whom the Defendants labeled a "Qualified Mental Health Professional," evaluated Mr. Butler.[1] J.A. 109; J.A. 739. Mr. Johnson, who is not a psychiatrist, psychologist, or medical doctor, wrote in Mr. Butler's medical file that his behavior was consistent with Borderline Personality Disorder and therefore was "not

---

[1]  A Qualified Mental Health Professional is an employee in a designated state mental-health-and-wellness-services position. That position requires a bachelor's degree in a human-services-related field and ongoing education in mental-health topics. Virginia Department of Corrections, *Mental Health and Wellness Services: Screening, Assessment, and Classification*, VIRGINIA DEPARTMENT OF CORRECTIONS OPERATING PROCEDURE 730.2 3–4 (Apr. 1, 2024), https://tinyurl.com/5cbc4dud. That is categorically different from a Mental Health Clinician, who is authorized to treat serious psychological conditions and must have at least a master's degree in psychology, social work, or a relevant human-services field, plus knowledge, training, and skills in the *diagnosis and treatment of mental-health disorders*. *Id.*

mental illness." J.A. 748. Johnson recorded this opinion in the Mental Health Chronic Care Committee minutes log for Mr. Butler. J.A. 748. Because Mr. Butler "refused to say if he was trying to kill himself," Johnson did not consider Mr. Butler suicidal. J.A. 701. Yet Johnson also noted that Mr. Butler was "in medical, reporting that he is going to hang himself." J.A. 748. Later that day, Mr. Butler did in fact try to hang himself from a ceiling light. J.A. 701.

Mr. Butler's condition continued to deteriorate: Over the next 11 days, he cut his arm (J.A. 99); according to Defendants' evidence, he said that "he had plenty tricks up his sleeve" and threatened Superintendent Hull's job by "kill[ing] himself" (*id.*); he twice threatened to cut off his testicles with a razor (J.A. 89); and he forced multiple pieces of metal into his penis (J.A. 731). Mr. Butler required medical treatment at the hospital for the arm wound (J.A. 89) and was sent to a urologist for the metal in his penis (J.A. 731).

More than a month into Mr. Butler's prolonged punitive segregation, Superintendent Hull finally suggested that Mr. Butler be put in safety mittens. J.A. 91. Mr. Butler quickly destroyed or escaped from the mittens, going through six pairs in four days. J.A. 99–100.

On September 27, Mr. Butler told medical staff that he had swallowed a razor blade, inserted more metal into his penis, and forced a rusty nail

into his anus. J.A. 100. That same day, Mr. Butler informed Johnson, the substance-abuse counselor, that he "had a razor" and "was going to hang or cut himself . . . and kill himself." *Id.*; *see also* J.A. 751; J.A. 732. While reporting that Mr. Butler had Antisocial Disorder and "likely" Intermittent Explosive Disorder,[2] Johnson made no mention in his notes of Mr. Butler's being suicidal. J.A. 751. The next day, Mr. Butler destroyed his seventh pair of mittens; a guard saw metal hanging from his mouth; and he was rushed to the hospital after an X-ray at the prison showed metal in his throat. J.A. 731; J.A. 751.

Superintendent Hull and Deputy Superintendent Major Back then directed Northern Neck guards to tape Mr. Butler's safety mittens, place him in a jacket, restrain his arms at the elbows, wrap chains and a Velcro strap around his waist, and put him in a restraint helmet. J.A. 92; J.A. 100.

In less than a month, Mr. Butler had destroyed two helmets and at least three more pairs of mittens, stuck wooden sticks into his penis, and swallowed and stuck metal into his penis and other parts of his body. J.A. 100–02; J.A. 731–32. On October 19, Mr. Butler swallowed a foreign object, and an X-ray showed a 7.4-centimeter piece of metal in his abdomen.

---

[2] *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 465 (5th ed. 2013); *Intermittent Explosive Disorder: Symptoms and Causes*, MAYO CLINIC (Jan. 6, 2024), https://tinyurl.com/zpcusajb (disorder that involves "repeated, sudden bouts of impulsive, aggressive, violent behavior or angry verbal outbursts" that "are too extreme for the situation").

J.A. 201; J.A. 733. Two days later, Superintendent Hull had Mr. Butler placed in four-point restraints and chained to a bed. J.A. 91. Hull also continued to have the guards check on Mr. Butler twice per hour (*id.*)—the minimum that Virginia requires for general inmate housing (6 VA. ADMIN. CODE § 15-40-1045 (2024)), not what a suicidal detainee might reasonably need.

During this period, Northern Neck twice referred Mr. Butler to Dr. Cohen, a psychiatrist at the University of Virginia. J.A. 92; J.A. 102–03; J.A. 109; J.A. 731–33. The record contains no observations or conclusions from those visits.

In late October, an officer found Mr. Butler with his neck bleeding and blood inside his mouth. J.A. 102. Mr. Butler was also continuing to cut at and jam metal into his neck. J.A. at 103. On October 23, Mr. Butler saw Dr. Cohen a third time. J.A. 92; J.A. 102–03; J.A. 109; J.A. 733. Two days later, Back ordered officers to check Mr. Butler every time they entered N Pod. J.A. 103. The next day, Mr. Butler was put in an adult diaper. J.A. 39; J.A. 92; J.A. 103. Mr. Butler "loudly complained" that the diaper was aggravating his already "mindboggling severe pain" from his penis injury. J.A. 39.

Though Dr. Cohen reported no findings in his first two meetings with Mr. Butler, Johnson, the substance-abuse counselor, stated in his affidavit

that after the third meeting Cohen agreed that Mr. Butler exhibited signs of "borderline personality disorder and possibly anti-social personality disorder." J.A. 109. Johnson nonetheless continued, both at the time and in his affidavit, to take the position that Mr. Butler was "faking or exaggerating symptoms for personal gain." J.A. 110. Thus, prison officials decided, Mr. Butler did not meet the state's Temporary Detention Order criteria, which provide for medically safer conditions of detention when one is "a danger to oneself or others" or is unable "to care for oneself" (J.A. 109)—notwithstanding that Mr. Butler reported that he was going to harm himself, was previously and later put on suicide watch, and threatened Northern Neck officials (J.A. 99; J.A. 101). If the officials had applied the TDO protocols, Mr. Butler would have been temporarily placed in a psychiatric facility.[3]

In early November, an X-ray showed a foreign object in Mr. Butler's pelvis. J.A. 733. Six days later, Mr. Butler complained of severe abdominal pain. *Id.* In mid-November, additional X-rays showed metal in Mr. Butler's neck, abdomen, and penis. J.A. 733. Mr. Butler was sent to the hospital to have metal removed from his neck and penis. J.A. 104. The hospital left the metal in his abdomen in place. *Id.*

---

[3] *See, e.g.*, *Involuntary Psychiatric Hospitalization*, FAIRFAX–FALLS CHURCH COMMUNITY SERVICES BOARD (June 2024), https://tinyurl.com/32sye7x8.

By late November, Mr. Butler reported that he was bleeding, could not urinate, and was experiencing bladder pain. J.A. 734. Two days later, Mr. Butler threatened to cut his throat. J.A. 104. The same day, he did exactly that (*id.*), cutting so deeply that "white meat hung." J.A. 43. Although Nurse Hryn recommended sending Mr. Butler to the hospital to get stitches and to address his high blood pressure, Back instructed the nurse to glue Mr. Butler's cut closed instead. *Id.*; J.A. 382 ("Lieutenant Newsome then handed me the phone and I spoke to Major Back [and] I voiced my concerns regarding Inmate Butler's BP being high and th[e] possibility of him needing stiches. Major Back had suggested that I put Liquid Bandage on."). Mr. Butler continued to self-harm by swallowing more metal. J.A. 104.

On December 3, Dr. James Dudley, one of the jail's physicians, confirmed the presence of metal in Mr. Butler's abdomen and penis. J.A. 129; J.A. 736. Dudley found in Mr. Butler's urethra a triangular piece of metal tied to a string. J.A. 129. At the jail two days later, Dudley tried unsuccessfully to remove the metal. *Id.* Dudley and urologist Jeffrey Haskins tried again at the hospital and were then successful. *Id.*

On December 13, Officers Laws Jr. was assigned as a floater to the jail building that contained N Pod. J.A. 501. At 12:40 p.m., ten minutes into his first security scan, Laws discovered that Mr. Butler had chewed through

11

his safety mittens. J.A. 501; J.A. 507; J.A. 513; J.A. 151.[4] Mr. Butler attests in his verified complaint that when Laws saw that he was out of the mittens, Laws merely walked away. J.A. 37. In an affidavit, Laws states that he immediately notified his supervisors, including Lieutenant Newsome. J.A. 507; J.A. 513; J.A. 151. Whatever the case may be, the record is clear that neither Newsome nor Laws nor any other officer acted promptly on that knowledge.

Laws looked in on N Pod at 12:57 p.m. and 1:17 p.m. J.A. 501. At 1:25 p.m., Laws entered Mr. Butler's cell to feed him. J.A. 501; J.A. 504; J.A. 513. Laws removed Mr. Butler's mittens to let him eat and then put them back on after he finished. J.A. 513. Officer Laws "did not have the authority or ability to replace Mr. Butler's restraints" without direction from his supervisors. J.A. 501. There was, however, a standing order from Back that should any officer observe Mr. Butler chewing on his restraints, the officer was to re-secure them with tape. J.A. 103.

After Mr. Butler ate, Laws did not conduct another security scan in N Pod until 2:30 p.m.—more than an hour later. J.A. 501; J.A. 37 (reporting that Laws "did not show up for an hour or so"). Mr. Butler attests that at one point during these checks he told Laws that "voices in his head was

---

[4] One of Laws's two affidavits states that Mr. Butler had chewed through one "restraint mitt." J.A. 507. Laws's other affidavit states that Mr. Butler had chewed through both. J.A. 151.

telling him to do something real crazy to himself." J.A. 36. Mr. Butler stated in his verified complaint that Laws "merely smirked" in response. *Id.*[5]

Meanwhile, as soon as Laws walked away, Mr. Butler worked on removing his mittens, spending about 30 minutes on each hand. J.A. 36. With more than an hour between some checks, Mr. Butler got out of his restraints. J.A. 37. Sometime between 2:00 and 2:30 p.m., Mr. Butler broke his leg shackles and the shackles that chained him to his bed. J.A. 37. At 3:10 p.m., Officer Veney took Laws's spot as the N Pod floater. J.A. 501. During Veney's rounds, Mr. Butler managed to tie a string from one of his destroyed mittens to a piece of shackle, tied the other end to the back of his teeth, and swallowed the metal shard. J.A. 37–38. He also jammed another broken piece of shackle into his penis. *Id*. Mr. Butler attested that he reported his actions to Officers Laws Sr. and Harris (J.A. 38); prison records state that Mr. Butler reported them to Veney (J.A. 509). Regardless, Veney then reported them to Lieutenant Newsome and medical personnel. *Id.*

After another twenty-five-minute delay—and more than three hours after Officer Laws's initial report to him—Newsome finally went to Butler's cell, accompanied by Nurse Shelton. J.A. 511. Mr. Butler was then assessed in Medical and returned to N Pod. *Id.* Captain Turner, Lieutenant

---

[5] Laws denied smirking and stated that Butler said that he was going to hurt a female officer. J.A. 151.

Newsome, and Officer Buntin placed Mr. Butler in a prison jumpsuit, added heavy-duty overalls and a winter coat, spun him in duct tape, and then put him in five-point restraints. J.A. 53–54; J.A. 511. Officers, including Turner, then warned Mr. Butler, as they had done multiple times in the past: "once you go low, we will go lower." J.A. 55.

That day, Dr. Dudley removed the shackle shard from Mr. Butler's throat. J.A. 130; J.A. 736. But he left a 4.1-centimeter piece—about the length of a housekey—in Mr. Butler's penis.[6] *See* J.A. 769; J.A. 39–40. Northern Neck officials continued to label Mr. Butler's behavior as "manipulative . . . but not suicide attempts." J.A. 757; J.A. 106.

Nine days later, the shackle shard was still in Mr. Butler's penis. J.A. 770; J.A. 736. Though Dudley reported an "unimpeded" urine flow and "no signs of infection" or "ill effect[s]" (J.A. 130), Mr. Butler stated that his penis was burning and his urine had a "foul smell" that officers "routinely commented on" (J.A. 40). The disposable diaper that Mr. Butler was forced to wear aggravated his genital pain. *Id.*

---

[6] After treating Mr. Butler on December 3, Dr. Haskins shared with Dudley an article that suggested "watchful waiting" on foreign bodies in the penis if "urine flow was unimpeded." J.A. 129. Mr. Butler's claims center not on that period before operating but instead on prison and medical officials' entire course of conduct being woefully inadequate, allowing for repeated severe self-mutilation.

In the last week of December, Mr. Butler broke the zipper on the winter coat that prison officials had forced him to wear and jammed the zipper into his penis "alongside the leg shackle piece." J.A. 65. Mr. Butler also continued destroying safety mittens and threatening to harm himself. J.A. 106. When Mr. Butler complained of pain and infection, Back replied that she'd "send [Mr. Butler] to the hospital when I'm good and ready! Maybe the pain will make you think twice next time!" J.A. 42.

X-rays in January confirmed that both the zipper and shackle shard were still in Mr. Butler's penis. J.A. 771. Dr. Haskins then removed the zipper but failed to remove the shackle shard because of its curvature and the bleeding that it was causing. J.A. 772–73. Haskins finally removed the shackle shard on January 17. J.A. 130.

A month before Mr. Butler was transferred out of Northern Neck, Hull ordered that the restraints be removed. J.A. 94. No longer chained in metal shackles, Mr. Butler had "no new cuttings or self-harm attempts." J.A. 759. On February 5, the Marshal service transferred Mr. Butler to another facility, ending his ordeal. J.A. 94.

## B.    History of This Action

Because he was being held in restraints in punitive segregation, Mr. Butler was unable throughout most of the four-month period at issue here to file grievances with the prison. J.A. 73. On January 22, as soon as he got

15

a pencil from another inmate, he started filing multiple grievances with Northern Neck. J.A. 72–73. All were denied. J.A. 73. Mr. Butler's grievance coordinator told him that the jail denied the grievances as untimely and because Superintendent Hull and other Northern Neck staff disliked him. *Id.*

After being transferred out of Northern Neck, Mr. Butler filed his original, verified *pro se* Complaint (J.A. 28), claiming that the jail officials and medical personnel violated his Fourteenth Amendment rights through deliberate indifference to his serious medical needs and failure to protect him from self-harm (*see* J.A. 411; J.A. 427–28).[7] Filing neither an answer nor a motion to dismiss, Defendants filed a motion for summary judgment eight months later. J.A. 80; J.A. 83.

In September 2019, Mr. Butler filed an amended verified *pro se* Complaint with supporting exhibits. J.A. 156. And in October, he filed both a motion requesting appointed counsel and his Opposition to Defendants' Motion for Summary Judgment. J.A. 277; J.A. 281. Mr. Butler then filed a second amended verified *pro se* complaint in March 2020. J.A. 387.

---

[7] The named Defendants are Superintendent Ted Hull, Deputy Superintendent Phyllis Back, Officer Christopher Laws Sr., Officer Christopher Laws Jr., Sgt. Tyler Taylor, Cpt. Daryl Turner, Lt. Jason Newsome, Lt. Eleazar Luna, Director of Inmate Services Amy Dameron, Officer Anthony Gray, Dr. James Dudley, QMHP Keith Johnson, and EMT James Barnes.

Nine days later, the district court rejected both amended complaints. J.A. 407–08. Two days after that, the court granted in large part Defendants' Motion for Summary Judgment, ruling that as to all but one defendant—Officer Laws Jr.—Mr. Butler had presented inadequate evidence to support his claims. J.A. 412. The court also denied Mr. Butler's motion for appointed counsel. J.A. 464.

Mr. Butler appealed that partial grant of summary judgment and simultaneously moved the district court to reconsider its judgment in favor of Newsome. J.A. 465; J.A. 470. The district court denied reconsideration. J.A. 478.

Two weeks later, Mr. Butler moved to amend his complaint on the surviving claims against Laws. J.A. 479. Two weeks after that, Defendants renewed their motion for summary judgment (J.A. 486), submitting new affidavits to support their renewed request (J.A. 489).

Mr. Butler filed his Opposition, supported by his affidavit that included exhibits that he had previously introduced as evidence with his amended complaints. J.A. 515. He also filed a motion to stay the proceedings, informing the court that he was being put on suicide watch—which continued from May through September 2020. J.A. 556; J.A. 560; J.A. 563. The court denied his stay motion because he appeared to no longer be on suicide watch by the time the court issued its ruling. J.A. 572.

In February 2021, the district court appointed Lana Manitta as Mr. Butler's counsel to determine whether Mr. Butler should have a guardian *ad litem*. J.A. 575–76. A month later, Mr. Butler informed the court that he had been on suicide watch again, from November 2020 through February 2021. J.A. 581. By June, Manitta expressly raised the question of Mr. Butler's incompetence and recommended appointment of a guardian *ad litem*. J.A. 586. In September, the court appointed a guardian *ad litem* and directed her to meet with Mr. Butler. J.A. 588–89. The next month, the case was reassigned to a different district judge.

After two failed attempts to connect with her client, the guardian *ad litem* reported the problem to the court, noting that Mr. Butler was again on suicide watch and had been for two months. J.A. 593. The guardian *ad litem* moved for a protective order to meet with Mr. Butler and his counsel. J.A. 594. She provided supporting exhibits detailing how Mr. Butler had not been allowed to meet with her or with his trial counsel. J.A. 626; J.A. 631–35; J.A. 637–39.

In November 2021, the last remaining defendant answered the initial complaint. J.A. 596. Less than two weeks later, Mr. Butler, through appointed counsel, moved to strike Laws's Answer and requested that the district court vacate the summary judgment dismissing the other Defendants. J.A. 640; J.A. 644; J.A. 646. Three days after Defendants filed

their opposition (J.A. 652), the court granted the protective order but denied Mr. Butler's motions to strike the Answer and vacate the partial summary judgment (J.A. 660).

In July 2022, the district court granted summary judgment in favor of Laws and denied Mr. Butler's cross-motion. J.A. 679. Two weeks later, Mr. Butler, through his guardian *ad litem*, appealed both summary-judgment rulings. J.A. 693.

## SUMMARY OF ARGUMENT

Pretrial detainees are entitled to more protections under the Fourteenth Amendment than convicted prisoners are under the Eighth Amendment, because detainees have not been convicted of any crime and therefore must not be punished. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Jail officials' treatment of pretrial detainees must be rationally related to legitimate, nonpunitive governmental purposes. *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (internal citation omitted). That requirement provides a genuine, substantial bar on deliberate mistreatment and protects detainees from objectively unreasonable conduct. *Id.* at 397.

Thus, although mere negligence does not violate the Fourteenth Amendment, reckless action or inaction does, if officials either knew or should have known that their conduct would result in harm or an unjustifiably high risk of harm. *Short*, 87 F.4th at 611. This Court

19

announced the objective standard—the "should have known" constructive-knowledge component—only after the court below granted summary judgment to all Defendants. Thus the court applied only an actual-knowledge test to the record evidence of failures to protect Mr. Butler from himself and deliberate indifference to his medical needs. J.A. 412. For that reason alone, the summary judgments should be vacated and remanded. But the court below also discredited genuine issues of material fact regarding the actual knowledge that jail and medical officials had, warranting reversal even under the subjective standard.

Mr. Butler presented substantial evidence that Northern Neck officials failed to monitor him adequately; failed to acknowledge the well-documented, clear risks of harm from his mental illness; and failed to protect him from self-harm. As no legitimate governmental purposes are served by leaving a pretrial detainee to self-mutilate and suffer, the record evidence is more than sufficient to preclude summary judgment for Superintendent Hull, Deputy Superintendent Back, Captain Turner, Lieutenant Newsome, Officer Laws Jr., or substance-abuse-counselor Johnson.[8] Even when evaluating the jail officials' actions under the subjective actual-knowledge test, Laws and Newsome, at the very least,

---

[8]  Mr. Butler does not appeal the district court's dismissal of Defendants Dameron, Luna, Taylor, Laws Sr., Gray, Dudley, and Barnes.

actually knew of the risks that Mr. Butler posed to himself, and they actually knew that their actions were inadequate to protect him.

Similarly, Mr. Butler raised genuine issues of material fact that Mr. Johnson, the putative medical expert, knew or should have known of Mr. Butler's serious medical needs, recklessly failed to address the risks from Mr. Butler's condition, and should have known that his own failures posed risks of harm to Mr. Butler. The record evidence also supports inferences that Hull, Back, Turner, and Newsome recklessly refused to change how Mr. Butler was treated despite his persistent and severe medical needs. Accordingly, there are fact questions whether these officials actually knew or should have known of Mr. Butler's condition and the risks their actions and inaction posed. For these reasons, summary judgment for Johnson, Hull, Back, Turner, and Newsome was improper.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo. *Alexander v. Connor*, 105 F.4th 174, 177–78 (4th Cir. 2024). The analysis is closer to a "motion to dismiss than a trial on the merits," crediting evidence presented by the nonmoving party "over any contrary evidence offered by the moving party." *Id.* at 178.

21

## ARGUMENT

In civil-rights suits, detainees like Mr. Butler do not bear the same burdens as convicted persons do. Rather, the Fourteenth Amendment affords more protections to pretrial detainees than the Eighth Amendment does to those who have been tried and convicted. *Kingsley*, 576 U.S. at 400. That is because detainees who have not been found guilty of any crime must not be punished. *Bell*, 441 U.S. at 535–37, n.16. Accordingly, there is no need to determine "when punishment is unconstitutional" under the Eighth Amendment; it is *always* unconstitutional. *Kingsley*, 576 U.S. at 400–01. The Fourteenth Amendment inquiry thus asks only whether the challenged governmental action or inaction is "rationally related to a legitimate non-punitive governmental purpose" or is instead "excessive in relation to that purpose." *Id.* at 398 (quoting *Bell*, 441 U.S. at 561). Because denying medical care and failing to protect an inmate from self-harm may cause pain and suffering, they amount to unconstitutional punishment. *See Short*, 87 F.4th at 610 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

In keeping with these strict rules, this Court announced last year in *Short* that pretrial detainees may bring Fourteenth Amendment claims based on "a variety of prison conditions" on either an objective or subjective basis. *Id.* at 610. The preexisting subjective test, which requires showing that a jail official actually knew and disregarded a substantial risk, is still

22

sufficient to establish culpability. But now a lesser showing of recklessness-—namely, that an official should have known of and adequately addressed a substantial risk—also suffices. *See id.* at 611. This expansion brought the Court's precedents in line with the Supreme Court's decision in *Kingsley,* which directs courts to be "more solicitous of the Fourteenth Amendment claims of a pretrial detainee." *Id.* at 609.

The court below, acting before this Court decided *Short,* granted summary judgment against Mr. Butler under the far more stringent subjective standard. The court's rulings thus turned on whether there was sufficient evidence of actual knowledge on the part of medical and other jail officials. Deeming there to be insufficient evidence on that score, the court below concluded as a matter of law that the officials' actions and failures to act did not, and could not, amount to constitutional violations. J.A. 431; J.A. 446. Because a showing of actual knowledge is no longer necessary to prove a Fourteenth Amendment claim, the judgment should at the very least be vacated and remanded for further consideration.

But beyond that, the court below also discounted Mr. Butler's substantial evidence (i) that the jail officials actually knew of his mental illness yet declined to prevent repeated and ongoing self-harm; (ii) that the jail's putative mental-health official did not exercise adequate, or any, medical judgment; and (iii) that the officials unreasonably denied medical

23

care. That record evidence is more than sufficient to permit a reasonable factfinder to return a verdict for Mr. Butler under either the newly announced "should have known" standard or the long-standing actual-knowledge standard. Hence, the summary judgments should be reversed and the case remanded for trial. *See Milla v. Brown*, 109 F.4th 222, 228 (4th Cir. 2024).

## I.   MR. BUTLER RAISED GENUINE ISSUES OF MATERIAL FACT THAT JAIL OFFICIALS FAILED TO PROTECT HIM.

This Court's expansion in *Short* of the constitutional standards for claims brought by pretrial detainees to include liability for what a reasonable official should have known but inadequately addressed applies to claims that jail officials failed to protect detainees in their custody. *See, e.g.*, *Hammock v. Anodh*, 2024 WL 33694 (4th Cir. Jan. 3, 2024) (per curiam). To prove that officials failed to protect them from injury, detainees must establish that (1) they were "incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant officials had a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). *Short* thus makes clear that a pretrial detainee like Mr. Butler may prove a defendant's culpable state of mind by showing that the "defendant's action or inaction was . . . objectively unreasonable." *Hammock*, 2024 WL 33694, at *1. Summary judgment for jail officials is therefore improper as long as a

plaintiff presents some evidence from which a factfinder could infer that the officials should have known of substantial risks of harm and did not adequately prevent that harm.

Here, the record provides more than enough evidence to support inferences that Northern Neck officials actually knew, and certainly should have known, that Mr. Butler required protection from his ongoing, extreme self-harm.

1. Under the actual-knowledge standard, jail officials have well-established duties to protect a detainee when they are aware of the detainee's destructive risks of self-harm. *Gordon*, 971 F.2d at 1097 (jailer has constitutional duty "to take reasonable measures to protect a prisoner from self-destruction when the jailer knows that the prisoner has suicidal tendencies"). In assessing whether an official is actually aware of the self-harming risks that a detainee poses, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm," which may be "infer[red] from circumstantial evidence," including from "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Additionally, jail officials are liable for their own decisions and actions while a detainee is in their care, even if that detainee was previously evaluated by a medical professional. *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008). Under *Short*'s constructive-knowledge standard, it follows that jail officials cannot escape

liability for failing to protect a detainee in their care from self-harm when that harm was either actually observed or reasonably observable.

Here, Mr. Butler has presented adequate evidence to survive summary judgment under either standard.

2. At the outset, there is record evidence that Northern Neck officials failed to monitor Mr. Butler in accordance with even the regular Virginia Department of Corrections' Minimum Standards for Jails and Lockups (6 VA. ADMIN. CODE § 15-40-1045 (2024)), much less the standards that apply, or surely should apply, to detainees with serious psychological illnesses. Although a violation of state correctional policy might not establish a constitutional violation, it is highly probative of what the reasonable standard of care actually is, and thus what is constitutionally mandated. *See, e.g.*, *Jackson v. Sampson*, 536 Fed. App'x 356, 357–58 (4th Cir. 2013).[9]

Starting when he was first placed in punitive segregation, Mr. Butler told jail officials that the level of monitoring was inadequate given his

---

[9] "Professional norms may be," and routinely are, "reflected in" even *nonbinding* standards. *Stokes v. Sterling*, 10 F.4th 236, 246 (4th Cir. 2021), *vacated on other grounds*, 142 S. Ct. 2751 (2022). For example, the Supreme Court and this Court regularly look to the American Bar Association's Model Rules of Professional Responsibility and "other comparable guides" to evaluate the reasonableness of attorneys' conduct. *Id.*; *accord Wiggins v. Smith*, 539 U.S. 510, 524 (2003). If the ABA's nonbinding Model Rules may provide standards against which to evaluate attorneys' professional conduct, surely state Department of Corrections regulations may provide standards against which to evaluate the reasonableness of the jail officials' monitoring schedule for Mr. Butler.

condition and the ongoing dangers of self-harm. J.A. 35. During this period, guards ostensibly conducted twice-per-hour security checks (J.A. 701), though even this level of monitoring was inconsistently applied (*see* J.A. 492). Beyond Mr. Butler's warnings, jail officials were well aware that Mr. Butler had a troubled history. *See, e.g.*, J.A. 87. Mr. Butler made it known through both words and actions that the unsupervised time in between twice-per-hour security checks was enough for severe self-mutilation. *See, e.g.*, J.A. 91; J.A. 99–100; J.A. 751. And Mr. Butler had previously been placed on suicide watch at the Northern Neck facility. *See, e.g.*, J.A. 98. Though the risk of harm to Mr. Butler was obvious (*cf. Farmer*, 511 U.S. at 842), jail officials did not remove metal from his cell, place him under more frequent supervision, place him in a camera-equipped cell, transfer him to a psychiatric facility, or do anything else to address the risks that he posed to himself. On the basis of this evidence, a reasonable factfinder could conclude that Northern Neck officials should have known that they could not ignore Mr. Butler's cries for help.

3. Neither may the jail officials avoid liability for their failings by asserting reliance on Mr. Johnson's assessments, for reliance here would have been objectively unreasonable. Johnson concluded that Mr. Butler's behavior was consistent with Borderline Personality Disorder and therefore was *not* a mental illness. J.A. 748. It is objectively unreasonable for a

27

mental-health professional to find that an inmate suffers from Borderline Personality Disorder, a recognized mental illness, and yet is not mentally ill. *Cf.* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 663 (5th ed. 2013); NATIONAL INSTITUTE OF MENTAL HEALTH, *Borderline Personality Disorder* (April 2024) ("Borderline personality disorder is a mental illness that severely impacts a person's ability to manage their emotions."). It is also objectively unreasonable for a substance-abuse counselor to diagnose and prescribe (or deny) treatment for psychiatric conditions unrelated to substance use. Other jail officials cannot, therefore, escape liability for their own decisions and actions by holding up Johnson's incongruous opinions. *See, e.g.*, *Iko*, 535 F.3d at 242. Nor, for that matter, could they substitute Johnson's judgment for their own even if he had been qualified to render a psychiatric diagnosis. *Id.* Hence, they cannot justify leaving Mr. Butler unsupervised for extended periods when it was plain that he would self-mutilate.

4. Although Northern Neck officials may have taken some steps to constrain Mr. Butler, he repeatedly chewed through safety mittens, broke restraints and safety helmets, and used those materials to harm himself. Yet all jail officials did in response was to keep repeating the very same inadequate, ineffective, and ultimately harmful tactics.

In a particularly concerning incident in December 2017, for example, jail officials left Mr. Butler in his cell unsupervised, wearing the type of metal shackles he had previously broken and the type of protective mittens he had previously chewed through. J.A. 708; J.A. 513. He had also previously used the broken pieces to harm himself. J.A. 704–05. During a routine security check that day, Officer Laws observed that Mr. Butler had torn free from his mittens, exposing the metal shackles below. J.A. 491. Importantly, earlier that day, Mr. Butler had told Laws that the "voices in his head was telling him to do something real crazy to himself." J.A. 36. Although Laws may have notified his superiors, including Lieutenant Newsome, he failed to take expressly authorized steps to protect Mr. Butler from harming himself. Though only Newsome or another supervisor could order replacement of the security mittens, Deputy Superintendent Back had issued a standing directive that if any officer saw Mr. Butler chewing on his restraints, the officer should add more tape to keep the mittens in place. J.A. 103. But Laws did not follow this directive. Hence, there is a genuine issue of material fact whether Laws did enough to protect Mr. Butler from himself in the face of clear, immediate, substantial risks of self-harm.

What is more, after failing to re-tape the protective mittens and leaving Mr. Butler free to work on the metal shackles that he had previously used to injure himself, there is substantial evidence that Laws did not

29

conduct even the minimal twice-per-hour security checks on Mr. Butler. While Laws says that he performed those twice-per-hour checks and even checked on Mr. Butler twice more each hour (J.A. 151), another of Defendants' affidavits shows that on December 13, Laws did not check on Mr. Butler for over an hour (J.A. 492; J.A. 501). Eventually, when Officer Veney took over for Laws and entered Mr. Butler's cell to perform a security check, Mr. Butler informed Veney that during Laws's shift he had broken his shackles and harmed himself by inserting two pieces of metal into his body, one in his throat and another in his penis. J.A. 492; J.A. 501. On the basis of Defendants' own evidence, a reasonable factfinder could thus conclude that Laws should have known that his failure to conduct a security check on Mr. Butler for more than an hour, after seeing him destroy his mittens, would lead to Mr. Butler's harming himself—as it had numerous times before.

5. For Newsome's part, though Laws reported around 12:40 p.m. that Mr. Butler had chewed through his mittens, Newsome did not act on the report or actually go to Mr. Butler's cell to assess the damage, much less take any steps to prevent harm, until 3:45 p.m. J.A. 492; J.A. 501; J.A. 507. In fact, Newsome did not step in until Veney had notified him a second time that Mr. Butler had broken his shackles, explaining that by that point Mr. Butler had inserted metal fragments into his body. J.A. 492; J.A. 501;

30

J.A. 509; J.A. 511. Although the court below concluded that as a matter of law Newsome could not have failed to protect Mr. Butler on December 13 because, by the time Newsome learned of the damaged mittens, the injuries had already occurred (J.A. 441), the record supports a different inference: Some three hours passed from when Newsome first learned of the damaged mittens to when he responded.[10] In other words, Newsome waited more than three hours to assess Mr. Butler's situation and needs, allowing him ample time to break his shackles and harm himself. The time that Newsome allowed to pass, along with Mr. Butler's known history of self-harm at any opportunity, raises   genuine issues of material fact whether Newsome should have known that his failure to act would lead Mr. Butler to self-harm.

6. Indeed, even under the higher bar of an actual-knowledge test, there is ample record evidence to raise material questions whether the jail officials did in fact know of the risk that Mr. Butler posed to himself. A pretrial detainee like Mr. Butler may demonstrate this actual knowledge

---

[10] The court below acknowledged, in denying Mr. Butler's motion for reconsideration, that Newsome might have learned of the destroyed mittens before Mr. Butler injured himself. J.A. 477. But the court opined that Newsome had no reason not to trust the other officers tasked with checking on Mr. Butler, so he could not be culpable. *Id.* The court did not, however, consider the evidence that officers could retape but not entirely replace the mittens, which required a supervisor's approval—approval that Newsome failed to give.

with evidence that the circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past . . . ." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). Not only were the jail officials here aware of Mr. Butler's history of self-harm (*see, e.g.*, J.A. 43; J.A. 86–95; J.A. 97–106; J.A. 731–36), but there is record evidence that in December Mr. Butler expressly told Laws that he might do something "real crazy" to himself (J.A. 36). Yet jail officials failed to act to protect him. Most notably, Laws failed to take even simple steps to retape Mr. Butler's mittens or perform the security checks needed to prevent Mr. Butler from further destroying his restraints, and Newsome failed to intervene promptly to order replacement of those restraints.

*     *     *

Under either the objective constructive-knowledge test that this Court articulated in *Short* or the more stringent subjective actual-knowledge standard, Mr. Butler introduced evidence on which a factfinder could determine that jail officials failed in their duty to protect him from self-harm. Crediting all evidence favorable to Mr. Butler as the nonmoving party, multiple genuine issues of material fact preclude summary judgment against him on his failure-to-protect claims.

## II.   MR. BUTLER RAISED GENUINE ISSUES OF MATERIAL FACT THAT JAIL OFFICIALS WERE DELIBERATELY INDIFFERENT TO HIS SERIOUS MEDICAL NEEDS.

A claim of deliberate indifference under *Short* has four elements:

1.  The pretrial detainee "had a medical condition or injury that posed a substantial risk of serious harm."

2.  Jail officials "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed."

3.  Jail officials knew or should have known both that the pretrial detainee had a serious medical condition and that their action or inaction posed "an unjustifiably high risk of harm."

4.  The pretrial detainee was harmed as a result of the jail officials' actions or inaction.

87 F.4th at 611.

The first and fourth elements are not genuinely at issue in this appeal. And *Short* expanded the showings sufficient to establish the second and third elements, to include the objective should-have-known standard. Because the district court, acting without the benefit of *Short*, considered only the subjective actual-knowledge standard, vacatur and remand are necessary to apply the proper legal test. But also, because there is substantial record evidence of the jail officials' actual knowledge, summary judgment was improper under even the actual-knowledge test. So reversal and remand for trial (with instructions that either actual or constructive knowledge suffices) would in fact be proper.

33

A. **The jail officials here may be held liable if they knew or should have known of Mr. Butler's mental illness and did not adequately address it.**

There can be no serious dispute that there are genuine issues of material fact precluding summary judgment on the first and fourth elements of the deliberate-indifference claims; indeed, were Mr. Butler requesting that this Court grant summary judgment to him, the undisputed record evidence would establish these elements as a matter of law. *Short*'s addition to the second and third elements—that reckless conduct and constructive knowledge suffice (87 F.4th at 611)—expand the required judicial inquiry.

1. At the outset, this Court has long recognized that "serious psychological conditions" require medical attention. *Gordon*, 971 F.2d at 1094. Mental-health claims are "just as serious[] as any physical health claim." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)). Hence, "continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013).

There is abundant record evidence that Mr. Butler suffered from severe mental illness and attendant physical injuries—not just risks of harm—that included the pain and bleeding from cuts to his arms and neck

34

and from metal shards in his penis. There is likewise abundant evidence that the jail officials are responsible for these harms. Most obviously, Mr. Butler was allowed continued access to metal shards and zippers, which he inserted into his penis. J.A. 39–40; J.A. 64–65. He suffered pain and symptoms of infection—fevers, foul-smelling urine, and a "burning" penis. J.A. 40. These severe, agonizing conditions persisted for a month before jail officials bothered to try even an "unsuccessful and very traumatic surgery" that led to yet "more bleeding and sickness." J.A. 74–75. This evidence strongly suggests that they did not provide reasonable or timely interventions. Accordingly, Mr. Butler raises genuine issues of material fact on the first and fourth elements of his deliberate-indifference claims.

2. The second and third elements—which *Short* expands—are at issue in this appeal. After *Short*, a detainee may establish deliberate indifference by showing that officials were reckless in the face of either a known risk of harm or a risk sufficiently obvious that they should have known of it. 87 F.4th at 611; *see also Farmer*, 511 U.S. at 836–37. In clarifying that those elements include objective inquiries, this Court lessened the showings that pretrial detainees must make for Fourteenth Amendment claims compared to what the Eighth Amendment requires. *Short*, 87 F.4th at 611. And because the Eighth Amendment protects convicted persons from indifference to risks of harm as well as from denial, interference, or delay of

medical care (*Gamble*, 429 U.S. at 104–05), pretrial detainees are entitled to at least that much (*Bell*, 441 U.S. at 535).

>    **B.    Substantial record evidence supports that Mr. Johnson recklessly acted and failed to act, exhibiting deliberate indifference to Mr. Butler's serious medical needs.**

1. Because medical officials violate the Eighth Amendment when they are deliberately indifferent to convicted persons' medical needs (*Gamble*, 429 U.S. at 104), the same must necessarily be true for pretrial detainees under the Fourteenth Amendment (*Kingsley*, 576 U.S. at 400–01). A medical official's decision made in the "absence of professional judgment" supports a finding of deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). To exercise professional judgment at all, an official must be "competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg v. Romeo*, 457 U.S. 307, 323 n.30 (1982). Hence, those diagnosing mental illnesses must be "properly qualified and trained." *Ruiz v. Estelle*, 503 F. Supp. 1265, 1333 (S.D. Tex. 1980) (treatment center lacked qualified, trained personnel, resulting in psychological evaluations without meaningful patient histories or observations), *aff'd in part and rev'd in part*, 679 F.2d 1115, *vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982). Otherwise, "short and sketchy and lacking" patient evaluations and "logically inconsistent diagnoses" may result. *Id.* at 1333.

Furthermore, a medical professional may be liable after deciding that a detainee is malingering rather than in actual medical need. *See*, *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). When a detainee reports ongoing suffering because a treatment regimen is ineffective, whether the medical judgments were reasonable or reckless "is an issue for the jury." *Id.*

2. The record amply supports inferences, and therefore raises issues for trial, as to Mr. Johnson's qualifications to diagnose and treat Mr. Butler—or any psychiatric patient. Johnson identified himself below as "a substance abuse counselor" (J.A. 108)—a title that facially shows a lack of expertise in diagnosing and prescribing treatments for severe psychiatric illnesses unrelated to substance abuse (*cf. Youngberg*, 457 U.S. at 323 n.30).

Johnson was employed as a Qualified Mental Health Professional (J.A. 108; J.A. 430), which under Virginia regulations is not a psychiatrist or psychologist or medical doctor. *See* Virginia Department of Corrections, *Mental Health and Wellness Services: Screening, Assessment, and Classification*, VIRGINIA DEPARTMENT OF CORRECTIONS OPERATING PROCEDURE 730.2 3–4 (Apr. 1, 2024) (Qualified Mental Health Professional need have only "a bachelor's degree in human services or a related field, supervised experience . . . and ongoing education in mental health topics"). Had Johnson been a psychologist or psychiatrist, he surely would have said so in his affidavit—and defense counsel would have so argued.

37

Whatever training Johnson might have, the record evidence about him, including from his own affidavit, belies any suggestion that he had the training or expertise to diagnose and treat serious mental illnesses like Mr. Butler's. If he did, he would at the very least have the title and associated job description that the State specifies for those functions—namely, Mental Health Clinician. *Id.* at 3 (patients with Serious Mental Illnesses such as psychotic disorders, bipolar disorders, and major depressive disorders, but excluding substance-use disorders, must be treated by Mental Health Clinicians, who must have advanced training that includes "at least a master's degree in psychology, social work, or relevant human services field"). Podiatrists are undeniably medical professionals. But they do not have the training, expertise, or experience to diagnose and prescribe treatments for cataracts or brain cancer or multiple sclerosis. And substance-abuse counselors, though trained to help with substance-use problems, do not possess the advanced training and expertise to diagnose and treat severe mental illnesses.

What is more, even if Johnson had possessed the pertinent educational qualifications, his diagnosis of Mr. Butler is facially invalid and devoid of professional judgment. Johnson determined that Mr. Butler's behavior was "consistent with borderline personality disorder, not mental illness." J.A. 748. But as already explained, Borderline Personality Disorder

38

is a recognized mental illness. *See supra* pp. 27–28. Johnson's determinations are inherently contradictory and irreconcilable with any sound medical judgment. Indeed, so bizarre were Johnson's conclusions that they constitute yet more record evidence that he lacked the professional competence to serve as a mental-health professional here. *See Ruiz*, 503 F. Supp. at 1333.

To be sure, Dr. Cohen, a psychiatrist at the University of Virginia who was not a defendant in this action, also evaluated Mr. Butler. J.A. 109. Mr. Johnson stated in his affidavit that Dr. Cohen agreed that Mr. Butler presented behavior consistent with Borderline Personality Disorder and Antisocial Personality Disorder. *Id.* Johnson did not, however, report that Dr. Cohen agreed with Johnson's own views that Mr. Butler was malingering, not suicidal, and not mentally ill. *See id.* Thus, the record evidence of Dr. Cohen's medical opinions supports Mr. Butler and does nothing to excuse Johnson's or other Defendants' failings. And whether Johnson was correct that Mr. Butler was malingering and had no mental illness (despite identifying Mr. Butler as having Borderline Personality Disorder) is at the very least a question for trial.

The district court's crediting of Mr. Johnson's determinations over the strong, undisputed record evidence of continuing self-harm and reported pain (J.A. 432) was not appropriate on a motion for summary judgment. And

because the court did not appoint counsel for Mr. Butler until after the first summary judgment dismissed Johnson (and even then, counsel was denied access to Mr. Butler), there should at the very least be a remand for further discovery before reconsideration of the summary-judgment motions.

**C.  Substantial record evidence supports that jail officials knew or should have known of Mr. Butler's serious medical needs and were reckless regarding the risks and harms from their actions.**

Even if a qualified medical professional prescribed and carefully provided treatment based on valid, informed medical judgments, that professional and other jail officials may still be liable for deliberate indifference. *Gamble*, 429 U.S. at 104–05. Again, because convicted persons are entitled to receive timely, appropriate care to avoid the "unnecessary and wanton infliction of pain" (*Gregg v. Georgia*, 428 U.S. 153, 173 (1976)), pretrial detainees deserve at least that much (*Kingsley*, 576 U.S. at 400–01).

Mr. Butler provided ample evidence to raise fact questions whether jail officials intentionally, knowingly, or recklessly failed to address risks of harm and instead doggedly persisted in using tactics that were inadequate to prevent Mr. Butler from self-harming. Under their supervision, Mr. Butler inserted sharp objects into his penis, anus, and neck on at least sixteen separate occasions over a period of four months. *See supra* pp. 5–15. There is thus substantial evidence that the jail officials left Mr. Butler to

40

experience "mindboggling severe pain" (J.A. 39), which was "unnecessary and wanton" (*Gregg*, 428 U.S. at 173).

1. Although reasonable medical disagreements over the proper course of treatment do not amount to deliberate indifference (*Wright v. Collins*, 766 F.2d 841, 848 (4th Cir. 1985)), simply providing "some treatment" does not make that treatment reasonable as a matter of law (*De'lonta*, 708 F.3d at 526 (though medication was administered to self-harming patient, that treatment must be "a reasonable method of preventing further mutilation" to preclude finding of deliberate indifference)). If a detainee has a "blatant and obvious condition," jail officials must at least investigate further to determine whether the detainee is getting worse or received an incorrect initial diagnosis or treatment plan. *Brown v. Lamanna*, 304 Fed. App'x 206, 208 (4th Cir. 2008) (citing *Greeno*, 414 F.3d at 655). And while detainees might not be entitled to their first choice of treatment, the treatment that they do receive must be "adequate to address [their] serious medical need." *De'lonta*, 708 F.3d at 526. Administering an "easier and less efficacious treatment" rather than a more effective one may amount to deliberate indifference. *Gamble*, 429 U.S. at 104, n.10 (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)).

Here, there is at least a genuine issue whether jail officials' choices of easily escaped or broken restraints and infrequent monitoring in a camera-

41

less punitive-segregation cell were objectively reasonable given Mr. Butler's ongoing, "blatant[,] and obvious" self-harm (*Brown*, 304 Fed. App'x at 208). There is ample evidence from which to infer that the jail officials should at the very least have investigated other treatment options—including, for example, the suicide watch that Mr. Butler requested and that had received both before and after the four-month period of punishment and ineffective measures at issue here. *See* J.A. 98; J.A. 581. The record evidence that jail officials chose an "easier and less efficacious treatment" (*Williams*, 508 F.2d at 544) that again and again provided Mr. Butler with sufficient unmonitored time and access to metal scraps to engage in severe self-mutilation raises questions of fact for trial on deliberate indifference.

2. Mr. Butler also introduced evidence giving rise to genuine disputes whether Back and other jail officials unreasonably delayed in administering medical care, contrary to the recommendations of medical staff. After Mr. Butler cut himself severely in November 2017, Nurse Hryn recommended that he be sent to the hospital to get stitches and also to receive treatment for high blood pressure. J.A. 43; J.A. 382. Yet Back instructed Hryn to glue the plaintiff's cut instead (J.A. 43; J.A. 382), choosing the "easier and less efficacious treatment" (*Williams*, 508 F.2d at 544) rather than one that addressed both the actual harm of the cut and the additional risks from high blood pressure. While not an absolute denial of care, Back's choice to direct

42

care that was contrary to Hryn's medical judgment supports an inference of intentional interference with prescribed treatment—precisely the opposite of what is constitutionally required. *See Gamble*, 429 U.S. at 104–05.

3. Deliberate indifference to medical needs may also be found when jail officials "obdurate[ly] refus[e]" to change a course of treatment despite "repeated reports" of its failure to improve an inmate's condition. *Greeno*, 414 F.3d at 654. Though the district court in *Greeno* had rejected the plaintiff's deliberate-indifference claim because his "complaints were not ignored" (*id.* at 654), the Seventh Circuit vacated the judgment in favor of several defendants, holding that their "dogged[] persist[ence] in a course of treatment known to be ineffective" may violate the Eighth Amendment (*id.* at 655).

Here, Northern Neck officials refused to change the course of treatment despite their repeated failures to prevent Mr. Butler's self-harm and pain. After Johnson discounted and ignored the self-mutilation as "[m]anipulative behavior" (J.A. 748), Mr. Butler jammed five pieces of floor tile into his penis (J.A. 751), "started cutting," and swallowed more metal (J.A. 751; J.A. 755). Mr. Butler complained that the jail officials' responses were ineffective and that he was continually in pain. *See*, *e.g.*, J.A. 39; J.A. 42. Even though Mr. Butler's complaints were not entirely ignored, the jail officials seemingly relied on Johnson's dubious determination that Mr.

Butler was malingering as they persistently restrained him (J.A. 113; J.A. 118) rather than, for example, implementing more frequent supervision, providing other therapeutic interventions, or transferring him to a psychiatric facility.

Additionally, when obdurate refusal to alter a course of treatment coincides with a showing of bad faith, a factfinder may reasonably find for the detainee. *See Greeno*, 414 F.3d at 654 (nurse's comments that inmate would be "locked up" for longer if he continued to be a "hassle" supported deliberate-indifference claim).

There is record evidence of bad faith: Officers, including Turner, repeatedly threatened Mr. Butler that "once you go low, we will go lower." J.A. 55; *see Greeno*, 414 F.3d at 654. And when Mr. Butler complained of pain and infection, Back told him that she would "send [him] to the hospital when I'm good and ready! Maybe the pain will make you think twice next time!" J.A. 42.

4. What is more, prison officials cannot evade liability for the harms to a pretrial detainee if their actions have "nothing to do with a medical judgment." *Short*, 87 F.4th at 614. Except when a jail official "knew of and relied on a medical provider's evaluation *in the moment*, she cannot use the medical provider's inaction to justify her own post-hoc." *Id.* at 615 (emphasis in original). Nonmedical personnel are not shielded from all possible

44

liability "whenever a medical provider was at some point consulted." *Id.* at 614.

Neither does a medical determination or recommendation forever relieve prison officials of their duty to act when a course of treatment (or lack thereof) is ineffective. This Court made that legal principle clear under the Eighth Amendment, and therefore also under the Fourteenth, with a hypothetical: If a detainee falls and suffers serious injuries, and symptoms persist despite the medication provided initially, the detainee should "by all objective measure" be evaluated for surgery. *De'lonta*, 708 F.3d at 526. Simply put, jail officials cannot lawfully deny a detainee an additional medical evaluation and different or additional treatment when, as an objective matter, the current treatments are ineffective.

Therefore, the fact that Mr. Butler was "already under the care of physicians" (J.A. 434) is not an excuse for inaction. Johnson, Hull, Back, Turner, and Newsome remain independently legally responsible, and therefore liable, for their own decisions, actions, and inaction. *See Short*, 87 F.4th at 614–15. The jail officials moved Mr. Butler to punitive (not medical) segregation in N Pod "because of [a] disciplinary charge" (J.A. 89) that itself may have been the product of Mr. Butler's mental illness. Back and Turner oversaw Mr. Butler's incarceration on a "day-to-day basis." *Id.* Hull "became involved directly in [Mr. Butler's] management and care" and "devise[d]

creative alternatives" that substantial evidence shows did not work. J.A. 90. And again, despite Mr. Butler's injuries, Back told him that she would send to the hospital not when he needed treatment but instead when she was "good and ready!" J.A. 42. Indeed, Back and Turner themselves state in their affidavits that their decisions regarding Mr. Butler's restraints were based on their own understanding of his medical condition and their own assessment of risks, rather than those of doctors and nurses. J.A. 114; J.A. 119. Far from demonstrating that jail officials in those moments were attending to their constitutional duties of care or relying on reasonable treatment recommendations of medical professionals, the record evidence strongly suggests that they were making their own decisions—and not with an eye to getting Mr. Butler the care that he objectively needed.

5. As for the third element of the deliberate-indifference test, Mr. Butler has raised genuine issues of material fact that Johnson, Hull, Back, Turner, and Newsome should have known, or actually did know, of his serious mental illness and also knew or should have known that their actions and inaction posed unjustifiably high risks of harm. *See Short*, 87 F.4th at 611; J.A. 91 (describing actions that Hull and Back took in response to plaintiff's "harming himself," which resulted in Mr. Butler's "continu[ing] to engage in self-harm"); *see also* J.A. 109–10. If any jail officials did not actually know that their neglect of Mr. Butler's mental illness and its

46

symptoms posed an unjustifiably high risk of future self-harm—which, on the record evidence, is hard to imagine—there is a trove of evidence to support that they should have known: Mr. Butler self-harmed at least nineteen times over the course of four months. J.A. 418. Johnson observed and documented that behavior. *See, e.g.*, J.A. 748 (stating that Mr. Butler is "in medical, reporting that he is going to hang himself . . . [he] did cut himself"); *see also* J.A. 739; J.A. 751; J.A. 755; J.A. 757. Hull, Back, and Turner knew of Johnson's observations and Mr. Butler's acts of self-harm. *See* J.A. 88 (describing Hull's knowledge of Mr. Butler's self-harm; J.A. 91 (describing Hull's knowledge of Johnson's sessions with Mr. Butler and knowledge of the repeated self-harm); J.A. 118 (describing Back's knowledge); J.A. 113 (describing Turner's knowledge).

*      *      *

Accordingly, the record raises genuine issues whether Johnson, Hull, Back, Turner, and Newsome recklessly disregarded known or obvious risks of further harm when they failed to provide different or additional treatments to Mr. Butler.

## CONCLUSION

The judgment should be reversed and the case remanded for trial with instructions to apply the *Short* test. At minimum, the summary judgments should be vacated and remanded for reconsideration under *Short*'s objective standard.

47

Respectfully submitted,

/s/ *Richard B. Katskee*

RICHARD B. KATSKEE
MARGARET ASH†
SARAH GRACE HUDSON†
TIM SOUTHAM†
  *Duke University*
  *School of Law*
  *210 Science Dr., Box 90360*
  *Durham, NC 27708-0360*
  *(919) 613-7230*


*Counsel for Appellant*

Date:    November 18, 2024

---

† Law student appearing under Cir. R. 46(a).

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __22-6903__      **Caption:** Ricky Butler v. Edward Hull, et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [✓] this brief or other document contains ____10,912____ [*state number of*] words

- [ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 365 [*identify word processing program*] in Century Schoolbook measuring 14 pts [*identify font size and type style*]; **or**

- [ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Richard B. Katskee _____

Party Name Ricky Butler, Appellant _____

Dated: Nov. 18, 2024 _____